[Cite as *State v. Morris*, 2012-Ohio-22.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24034 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 09-CR-2159/1 |
| v. | : | |
| | : | |
| D'ALCAPONE A. MORRIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of January, 2012.

. . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. #0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorneys for Plaintiff-Appellee

JEREMIAH J. DENSLOW, Atty. Reg. #0074784, First National Plaza, 130 West Second Street, Suite 1600, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . .

HALL, J.

{¶ 1} D'Alcapone A. Morris appeals from his conviction and sentence on charges of murder, aggravated burglary, aggravated robbery, and a firearm specification.[1]

_____

[1] A jury convicted Morris of several other charges, which the trial court merged into those set forth above

**{¶ 2}** The record reflects that a jury found Morris guilty following an April 2010 trial. The State's evidence at trial established that on June 3, 2009, Morris and a companion, Michael Guy, arranged to have a female, Nichelle White, drive them to purchase marijuana from an individual named Richard Pogue.[2] Upon arriving at Pogue's residence, they discovered that he did not have the marijuana. Pogue agreed, however, to accompany them to the home of Javon Buckman, who had marijuana available. White drove the three men to Buckman's house on Kingsley Avenue. Once there, Buckman would allow only two of them to enter. As a result, Pogue and Guy went inside while Morris stayed outside.

**{¶ 3}** Inside the house, Buckman handed Guy some marijuana. Instead of paying, Guy pulled out a revolver he earlier had obtained from Morris and ordered Buckman and Pogue to the floor. As that was happening, Morris entered through the side door, punched Buckman and Pogue in their faces, took the revolver from Guy, and declared that Buckman and Pogue were about to die. With Guy standing in front of him and Morris standing behind him, Buckman heard Morris cock the revolver and fire a single shot. Guy and Morris then rifled through Buckman's pockets before fleeing the scene in White's waiting car. Pogue died as a result of a point-blank gunshot wound to his back. During their investigation, police identified Guy and Morris as suspects. They first located Guy, who led them to White. They later found Morris hiding under insulation in the attic of his girlfriend's house.

**{¶ 4}** Morris testified at trial and admitted being at Buckman's house with Guy and Pogue on the night in question. He admitted bringing a revolver with him but denied knowing

---

for purposes of sentencing. (Termination entry, Doc. #56).

[2]Throughout the record, we have found Richard's last name spelled "Pogue" and "Poe." For purposes of consistency, we will refer to him herein as "Pogue."

about a robbery. According to Morris, he entered the house after hearing or seeing commotion inside and saw Guy brandishing the gun. He testified that he was attempting to get the gun from Guy when it "went off." The jury nevertheless convicted Morris of all charges against him. The trial court imposed an aggregate sentence of thirty-five years to life in prison. Morris then filed this timely appeal, advancing eight assignments of error.

{¶ 5}   In his first assignment of error, Morris contends the trial court erred in denying his motion to suppress an out-of-court photo identification by Buckman and allowing Buckman to identify him at trial.

{¶ 6}   With regard to the photo-identification issue, the record reflects that, as part of his investigation, detective Michael DeBorde prepared six or seven photo spreads, with Morris being pictured in one of them. In early June 2009, the detective showed the photo spreads to Buckman, who was unable to identify anyone in any of them. (Trial transcript at 23). Approximately three weeks later, DeBorde and another detective showed Buckman another six-person photo spread that included a different, more recent picture of Morris. At that time, "Buckman indicated that he did not remember the photos from the [earlier] photospread[s]." (Suppression ruling, Doc. 35 at 4). Buckman then "stated that the persons in positions two and five looked a lot like the person who was at the residence on Kingsley on June 3, 2009," but he was uncertain. (Id.). One of the two pictures, in fact, was of Morris. At trial, DeBorde reiterated, however, that Buckman was not "a hundred percent sure" either of the two people had been present at the time of the shooting. (Trial transcript at 34). In his own trial testimony, Buckman recalled that he told the detectives both pictures looked like "the shooter" but he could not be sure. (Trial transcript at 423). Despite his inability to make a positive identification when viewing the photo spreads, Buckman subsequently testified at

trial and provided an in-court identification of Morris as the shooter. (Id. at 400-401).

{¶ 7} On appeal, Morris contends the trial court should have suppressed all evidence about the photo spreads shown to Buckman. Morris argues that it was unduly suggestive for police to show Buckman two photo spreads containing his picture, one in early June 2009 and one three weeks later. He points out that no other individual's photograph was shown to Buckman more than once. In its suppression ruling, the trial court rejected Morris's argument, reasoning:

{¶ 8} "Defendant argues that, as it relates to the two photo lineups shown to Mr. Buckman, that Mr. Morris' likeness was the only one in both arrays. However, Mr. Buckman indicated to the detectives that he did not remember the [earlier] pictures. Further, he was not shown one lineup on the first occasion, but instead was shown six to seven lineups, only one of which contained a photograph of Morris. Given the length of time between the two interviews with Mr. Buckman, and the differences in the two arrays containing Morris' pictures, as well as the number of arrays shown to Mr. Buckman, the court cannot say that there was anything suggestive in the manner or means employed with the lineups shown to Mr. Buckman. There is nothing distinguishing or different about the two pictures of Mr. Morris that would make them stand out or suggest that a witness was being directed to him." (Doc. #35 at 5-6).

{¶ 9} Upon review, we agree with the trial court that the photo-spread identification process in which Buckman participated was not suggestive. Morris's only argument is that detective DeBorde showed Buckman *two* photo spreads containing his picture. As the trial court noted, however, the pictures of Morris in the two photo spreads were different, the two reviews were separated by approximately three weeks, and Buckman testified that he did not

remember the pictures in the earlier photo spreads when he reviewed the later one. Under these circumstances, we find no error in the trial court's determination that there was nothing suggestive in the "manner or means employed with the lineups shown to Mr. Buckman." That being so, the disputed evidence was admissible and any remaining questions as to reliability went to the weight of the identification rather than its admissibility. *State v. Garrett*, Montgomery App. No. 22262, 2008-Ohio-3710, ¶13.

{¶ 10} With regard to Buckman's positive in-court identification of him as the shooter, Morris argues that this identification should have been disallowed because the prior, out-of-court photo identification was "unduly suggestive and the identification was unreliable." We disagree. Morris did not object to the in-court identification and, therefore, has waived all but plain error.

{¶ 11} We see no error, much less plain error, in allowing Buckman to identify Morris at trial. For the reasons set forth above, we conclude that the out-of-court photo-identification process was not suggestive. Moreover, the failure to make a positive pretrial identification does not preclude a witness from making a later in-court identification. *State v. Brown*, Montgomery App. No. 21540, 2007-Ohio-2098, ¶19. Buckman's trouble identifying Morris by reviewing photo spreads may have affected the weight of his in-court identification but not its admissibility. Moreover, an in-person identification can have different parameters such as height, weight, and a three-dimensional view that is not evident in a photograph. Accordingly, the first assignment of error is overruled.

{¶ 12} In his second assignment of error, Morris claims the trial court erred when it allowed Nichelle White to testify that she overheard him say, just days after the shooting, that he had been "born and raised to kill."

{¶ 13} Morris asserts that the foregoing statement was irrelevant or, alternatively, that its probative value was substantially outweighed by the danger of unfair prejudice. We disagree. The trial court acted within its discretion in finding the statement to be relevant. Such a statement made by an accused killer two days after a killing in which he has been implicated has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable * * * than it would be without the evidence." Evid.R. 401. Specifically, the statement is relevant to Morris's identity as the killer. The trial court also acted within its discretion in finding the probative value of the statement not substantially outweighed by the danger of unfair prejudice. Morris's statement had considerable probative value given that he made it shortly after a murder that he allegedly had committed. The second assignment of error is overruled.

{¶ 14} In his third assignment of error, Morris argues that his due process rights were violated when Pogue's mother testified about her surviving son and cried in front of the jury. The record reflects that Terry Clark briefly testified about having two sons, Richard Pogue and Quentin Clark, and identified their ages. Thereafter, the prosecutor showed Clark a picture of the decedent and she identified him as Richard Pogue. The trial transcript reflects that Clark was "crying" during this part of her testimony. Immediately after Clark identified her deceased son, the trial court took a five-minute break. During that time, defense counsel objected to the identification, arguing that Morris had offered to stipulate to identity.

{¶ 15} In response, the State denied that a stipulation had been offered. Moreover, the prosecutor correctly noted that the State was not required to accept a stipulation. See, e.g., *State v. Wilson* (Oct. 12, 1994), Lorain App. No. 92CA005396. The prosecutor further argued that Clark's testimony was pertinent to the aggravated robbery charge because she described

missing jewelry and other items that her deceased son had worn the night of his death. The trial court resolved the issue by instructing the jury to "disregard any display of emotion[.]"

{¶ 16} Upon review, we see no error in the trial court's handling of the situation. As an initial matter, Morris did not object to Clark's testimony about having a twenty-eight-year-old son named Quentin Clark. Therefore, he has waived all but plain error, which does not exist. With regard to Clark's identification of her deceased son's picture, the trial court acted within its discretion in giving a cautionary instruction, particularly when defense counsel never requested a mistrial. The third assignment of error is overruled.

{¶ 17} In his fourth assignment of error, Morris asserts that his convictions are against the manifest weight of the evidence. Notably absent from his brief, however, is any specific argument addressing the state of the evidence. After setting forth the standards governing a manifest-weight challenge, Morris asserts, in conclusory fashion, "that the case before the court presents exceptional circumstances in that the jury clearly lost its way when it found [him] guilty of the herein charges."

{¶ 18} We are unpersuaded that Morris's convictions are against the manifest weight of the evidence. Particularly in the absence of any argument from him on the issue, we do not find that the evidence weighs heavily against his convictions. The State presented testimony that fully supports his convictions for murder, aggravated burglary, aggravated robbery, and a firearm specification. Accordingly, the fourth assignment of error is overruled.

{¶ 19} In his fifth assignment of error, Morris maintains that the trial court erred in allowing the prosecutor to elicit hearsay testimony identifying him as the shooter. Detective Michael DeBorde of the Dayton Homicide Squad was assigned to investigate the death of

Richard Pogue. On the witness stand, the prosecutor directed DeBorde through the course of his investigation, asking how the detective constructed several photo spreads, as well as when, and how, the photo spreads were presented to Javon Buckman. DeBorde responded that he initially showed Buckman six or seven photo spreads, one of which contained a 2008 picture of the defendant. DeBorde included Morris's picture because he had received the name "D'Alcapone" through a "Crimestopper tip." (Trial transcript at 608).[3] Buckman was unable to identify anyone in the photo spreads. At trial, the prosecutor asked DeBorde: "* * * [D]id Mr. Buckman say that the shooter was not in any of those photo spreads?" The prosecutor apparently used the term "shooter" to refer to the person Buckman already had testified fired the shot inside his house that struck Richard Pogue.

{¶ 20} A couple weeks later, DeBorde constructed a photo spread containing a picture of Michael Guy. Buckman identified Guy as the "darker and shorter individual that had come into the house and pulled the gun on them, and then gave the gun over" to the defendant. (Id. at 615). DeBorde then was asked about how he got to the defendant to obtain a more current photograph for inclusion in another photo spread that Buckman eventually reviewed. The following is the direct examination of detective DeBorde about a jailhouse interview with Michael Guy:

{¶ 21} "Q. Now, you can't help [sic] us what he said, but let me ask you, Detective, did he identify the shooter, the individual–

{¶ 22} "[Defense Counsel]   Objection.

{¶ 23} "The Court:     Overruled. You can answer it if he did.

---

[3] The defense objected to this answer to a question but has not raised the overruling of that objection as part of the fifth assignment of error.

{¶ 24} "Q.   Correct.   Not eliciting the statements, as I said, without telling us what his answer was, did [Guy] tell you at that time, identify who the shooter was inside that house on Kingsley Avenue?

{¶ 25} "A.   He did.

{¶ 26} "Q.   And was he offered anything in exchange for that information that he provided in that interview?

{¶ 27} "A.   He was not. A cup of water.

{¶ 28} "Q.   Cup of water. Had he entered into any agreements with the state of Ohio at any time in that interview?

{¶ 29} "A.   He did not. We hadn't even spoken to the state of Ohio at that time.

{¶ 30} "Q.   In fact, did you even have a warrant for his arrest in reference to this case at the time of that interview?

{¶ 31} "A.   We did not.

{¶ 32} "Q.   Now, again, you can't tell us what he said, but let me just ask you, after interviewing   Michael Guy, who did you then try to seek out to interview?

{¶ 33} "A.   Ms. Nichelle White, and eventually D'Alcapone Morris."   (Id. at 617-618).

{¶ 34} Morris contends the foregoing testimony is tantamount to DeBorde saying Guy told him Morris was the shooter—which Morris contends would be inadmissible hearsay. We disagree. Our interpretation of the question, in context, is that DeBorde was being asked whether Guy provided the name of his accomplice, who the prosecutor was referring to as the "shooter." DeBorde merely testified that Guy "identified" the "shooter."   This testimony

apparently was not admitted for the truth of the matter, but rather to explain how the detective proceeded to the next step in his investigation. In that respect, the testimony was not hearsay at all. The testimony was carefully tailored to describe how DeBoard proceeded through his investigation. DeBorde added that, after interviewing Guy, he tried to interview White and Morris. DeBorde did not say that Guy identified Morris as the shooter, and such an inference, in our view, is not as clear as appellant argues. It could be that Guy merely suggested to DeBorde that White and Morris might have more or better information about the case.

{¶ 35} But our inquiry into whether the above questions and their answers should have been admitted does not end with the determination that the testimony does not contain hearsay.[4]  In *State v. Sinkfield* (Oct. 2, 1998), Montgomery App. No. 16277, a detective was permitted to testify that he included Sinkfield's photograph in a photo spread because police had received an anonymous "Crimestoppers" tip that Sinkfield was a suspect. On review, this Court cited as authority *State v. Blevins* (1987), 36 Ohio App.3d 147, for the proposition that when out-of-court statements are admitted merely to explain a police officer's conduct during the course of an investigation, "[f]irst, the conduct to be explained must be 'relevant, equivocal, and contemporaneous' with the out-of-court statements. Second, the out-of-court statements must meet the standard of Evid.R. 403(A). Thus, even if the statements are relevant to proving some fact other than the truth of the matter asserted, the evidence still must be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury." *Sinkfield*, citing *Blevins*. The Tenth District Court of Appeals has since expanded on *Blevins* to include a third criteria that "when

---

[4] Appellant's argument, and apparently the trial objection, is that the testimony elicits hearsay. It does not. But we continue with the analysis to describe the broader spectrum of case law affecting this kind of testimony.

the statements connect the accused with the crime charged, they should generally be excluded." *State v. Humphrey*, Franklin App. No. 07AP-837, 2008-Ohio-6302, ¶11.

{¶ 36} Here, the detective did not testify to any actual "statements" made by Michael Guy. One must infer from the detective's testimony, and subsequent actions, that Guy identified D'Alcapone Morris as his accomplice. But, for the sake of this discussion, we will assume that the testimony effectively contained a statement. That testimony was apparently "relevant" to the issues at hand. Without context or some explanation, the actions of the detective would be presented in a vacuum and would appear "equivocal." And, the continued course of the investigation was contemporaneous with the "statement."

{¶ 37} The next two questions are whether the prejudicial effect of the testimony outweighed the probative value and whether the "statements" should "generally be excluded." To put the "statement" testimony into perspective, Javon Buckman had already testified that two men robbed him and Richard Pogue, and a shot was fired by the defendant. Buckman hardly could have mistaken one of the robbers for the other. Guy was later described as 5'8" or 5'9" and 180 pounds. Morris was 4'11" and 100 pounds. Buckman identified Morris as the one who had fired the shot and who had punched him in the face. Nichelle White already testified that she had driven Morris, Guy, and "Red" (Richard Pogue) to Buckman's house. She saw Morris with the gun. At Buckman's house on Kingsley Avenue, the three got out of the car and went toward the house. Shortly thereafter, from her waiting car White heard gunshots. Morris and Guy returned to her car and left. Morris said his hand "was broke" and he had blood on his shirt. Later, Morris forensically was connected to the scene through testimony that his DNA was in a bloodstain on the back of the T-shirt Javon Buckman was wearing. Moreover, although clearly not evidence, in opening statements the jury heard

defense counsel disclose an expectation that Michael Guy would testify that D'Alcapone Morris was the one who pulled out the gun and committed the robbery. Guy was on both the State's and the defense's witness list but was not called by either. Given all of these circumstances to evaluate, we cannot say that admission of the "statement" that Guy identified his accomplice was an abuse of discretion.

{¶ 38} Assuming that we were to find an abuse of discretion, requiring exclusion of the described testimony, we still would be faced with evaluating whether admission of the testimony was harmless. All of the considerations in the previous paragraph go into that mix. In addition, unlike in *Sinkfield*, the prosecutor did not argue that DeBorde's testimony about Guy leading him to Nichelle White and then to the defendant should be considered as substantive evidence of the defendant's guilt. To the contrary, the prosecutor argued: "You can't speculate as to the reason why [Guy] wasn't called anymore than you can speculate as to what he would have said if he came in and testified. * * * You can't pretend you know what he would say. * * * And that's not evidence." (Trial transcript at 832). Finally, Morris testified himself. He acknowledged that he brought the gun to Buckman's house because "I'm a drug dealer. I–I carry a gun every day." (Id. at 743). He testified that Guy committed the robbery and he, Morris, tried to stop him by asking for the gun; and when Guy was reaching to give Morris the gun it went off. (Id. at 752). Additionally, unlike in *Sinkfield*, the jury had not been subjected to several "highly inflammatory and prejudicial" comments constituting "prosecutorial misconduct" that was apparent in that case. Here we conclude that the "statement" Guy made was, at most, harmless error beyond a reasonable doubt. For all of these reasons, the fifth assignment of error is overruled.

{¶ 39} In his sixth assignment of error, Morris contends the trial court erred when it

disallowed cross-examination of detective DeBorde about proffer and plea agreements between Michael Guy and the State. Morris contends that cross-examination regarding such agreements should have been allowed because the prosecutor had "opened the door" in her prior questioning of DeBorde.

{¶ 40} Upon review, we see no error in the trial court's ruling. The trial court allowed defense counsel to cross-examine DeBorde about the fact that the State had entered into proffer and plea agreements with Guy. The trial court reasoned, however, that unless Guy actually testified (which he did not do) the particular substance of the agreements was not relevant. We agree. The only apparent reason for seeking to cross-examine DeBorde about the agreements was to impeach Guy's credibility by establishing bias or interest. But Guy's credibility was not at issue because he did not testify. Accordingly, the sixth assignment of error is overruled.

{¶ 41} In his seventh assignment of error, Morris claims the trial court erred in allowing the prosecutor to elicit hearsay testimony from detective DeBorde about Javon Buckman identifying Morris as the shooter.

{¶ 42} Once again, we disagree. Buckman's statement to DeBorde identifying Morris as the shooter met the requirements for admissibility under Evid.R. 801(D)(1)(c) and R.C. 2945.55. Under the evidence rule, a statement is not hearsay if "[t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification." Here Buckman, the declarant, testified at trial and was subject to cross-examination about his identification. His statement to DeBorde identifying Morris as the shooter was made shortly after the shooting. Finally,

circumstances corroborated the reliability of Buckman's statement to DeBorde, including Buckman's own in-court identification of Morris as the shooter. Buckman's statement to DeBorde likewise satisfied R.C. 2945.55, which provides: "When identification of the defendant is an issue, a witness who has on previous occasion identified such person may testify to such previous identification. *Such identification may be proved by other witnesses*." (Emphasis added). As noted above, Buckman previously had identified Morris as the shooter. Therefore, the State was permitted to prove this identification through another witness such as DeBorde. See, e.g., *State v. Levingston*, Hamilton App. No. C-090235, 2011-Ohio-1665, ¶24-25. The seventh assignment of error is overruled.

{¶ 43} In his eighth assignment of error, Morris argues that the trial court erred in allowing the prosecutor to elicit hearsay testimony from DeBorde identifying Michael Guy as the person who had paid Nichelle White forty dollars for a ride. We reject this argument for much the same reason we overruled the seventh assignment of error. White testified at trial and was subject to cross-examination. Her statement to DeBorde identifying Guy as the person who had paid her forty dollars for a ride on the night of the shooting was made shortly after the incident. DeBorde's testimony about White's statement also was corroborated by her own in-court testimony that Guy paid her forty dollars to serve as the driver. At a minimum, White's statement to DeBorde identifying Guy as the person who had paid her forty dollars met the requirements for admissibility under Evid.R. 801(D)(1)(c). [5] Finally, even if DeBorde's testimony on this issue did constitute inadmissible hearsay, we would find its

---

[5]Parenthetically, we note that R.C. 2945.55 does not appear to apply to White's identification of Guy as the person who had paid her forty dollars because Guy is not the defendant here. Unlike Evid.R. 801(D)(1)(c), the statute is limited to "identification of the defendant."

admission harmless beyond a reasonable doubt. Testimony about the forty dollars was relatively insignificant, and White herself testified that Guy had paid her. Accordingly, the eighth assignment of error is overruled.

{¶ 44} Based on the reasoning set forth above, the judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . . .

GRADY, P.J., concurs.

DONOVAN, J., concurs in judgment only.

Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Jeremiah J. Denslow
Hon. Mary K. Huffman